UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS CLEGG,                     :
        Plaintiff,               :
                                 :
    v.                           :      CA 04-406 ML
                                 :
JO ANNE B. BARNHART,             :
COMMISSIONER,                    :
SOCIAL SECURITY,                 :
        Defendant.               :

## REPORT AND RECOMMENDATION

This matter is before the court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB"), under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) ("the Act"). Plaintiff Thomas Clegg ("Plaintiff") has filed a motion to reverse and/or remand. Defendant Jo Anne B. Barnhart ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

This matter has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence in the record and is not legally correct. Accordingly, based on the following analysis, I recommend that Plaintiff's Motion to Reverse and/or to Remand (Document ("Doc.") #11) ("Motion to Remand") be granted to the extent that the matter be remanded for further administrative proceedings as outlined below and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. #12) ("Motion to Affirm") be denied.

## **Procedural History**

Plaintiff initially filed an application for DIB on April 25, 2002, alleging disability since January 1, 2001, due to degenerative lumbar disc/spine disease. (R. at 16, 116-18, 126) The application was denied initially and on reconsideration (R. at 16, 75, 76, 78-81, 82, 83-86), and Plaintiff timely requested review by an ALJ (R. at 87-88). A hearing was conducted on December 18, 2003, at which Plaintiff, represented by counsel, appeared and testified before an administrative law judge ("ALJ"). (R. at 16, 34, 39-42, 44-62, 64-65) A medical expert ("ME") and a vocational expert ("VE") also testified. (R. at 16, 34, 42-44, 61-64, 65-72)

On April 13, 2004, the ALJ issued a decision in which she found that Plaintiff was not disabled and, therefore, not entitled to a period of DIB. (R. at 13-26) Plaintiff appealed the ALJ's decision to the Appeals Council (R. at 10, 11), which on July 30, 2004, declined Plaintiff's request for review (R. at 5-7), thereby rendering the ALJ's decision the final decision of the Commissioner (R. at 5).

Plaintiff filed a Complaint (Doc. #1) in this court on September 15, 2004. Defendant on November 30, 2004, filed her Answer (Doc. #4). On April 14, 2005, Plaintiff filed the instant Motion to Remand (Doc. #11). The Motion to Affirm (Doc. #12) was filed on May 5, 2005.

## **Issue**

The issue for determination is whether the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act, as amended, is supported by substantial evidence in the record and is free of legal error.

## **Background**

Plaintiff was born on June 18, 1963. (R. at 17, 116) He has a high school education and past relevant work experience as

2

a shell fisherman and part-time laborer for a swimming pool
company. (R. at 17, 37, 49, 127, 132, 139-42, 148-50)

## Medical Evidence

Regarding Plaintiff's physical impairments, the record
contains the following exhibits: office notes, messages, and test
results from NHCC Medical Associates, Inc., covering the period
from September 28, 1999, through July 11, 2003 (R. at 209-31,
281-86, 290-91); a report of an x-ray of Plaintiff's lumbar spine
taken on November 7, 2001, at Newport Hospital (R. at 190-91,
256); a December 14, 2001, consultation note from Sumit K. Das,
M.D., of Neurosurgery Associates, Inc., who evaluated Plaintiff
at the request of Scott Keigwin, D.O., and Anne Neville, RNP
("Nurse Neville") (R. at 195-96); a report of an MRI of
Plaintiff's lumbar spine ordered by Dr. Das and done at Newport
Hospital on December 27, 2001 (R. at 193-94, 199-200, 201-02,
257-58); a letter from Dr. Das to Nurse Neville dated January 4,
2002, regarding a follow-up visit (R. at 197); a letter from
Melvyn M. Gelch, M.D., who evaluated Plaintiff at the request of
Dr. Keigwin, to Dr. Keigwin dated February 15, 2002 (R. at 205-
06); a report pertaining to an epidural steroid injection ordered
by Dr. Gelch and performed at Newport Hospital on March 6, 2002
(R. at 203-04, 260-63); another letter, dated March 29, 2002,
from Dr. Gelch to Dr. Keigwin reporting on a reexamination of
Plaintiff (R. at 207); Physical Residual Functional Capacity
Assessments and DDS Case Review Forms from John R. Bernardo,
M.D., and Stephen R. Fish, M.D., dated June 27, 2002, and August
15, 2002, respectively, based on their review of the available
medical evidence[1] for Disability Determination Services ("DDS")
(R. at 232-41, 242-51); a Medical Questionnaire, Pain

---

[1] Both evaluators noted that the file lacked a statement
regarding Plaintiff's physical capacities from a treating source. (R.
at 238, 248)

3

Questionnaire, and Physical Capacity Evaluation all dated
September 17, 2002, from Nurse Neville (R. at 252-55, 287-89);
from the Pain Management Center at St. Anne's Hospital, treatment
notes from William E. Guptill, M.D., from Plaintiff's initial
evaluation on July 31, 2003, through December 30, 2003, reports
of epidural steroid injections performed on August 26, 2003, and
November 25, 2003, and notes pertaining to a physical capacity
evaluation by Joseph Doerr, M.D., done on January 8, 2004, at the
request of Plaintiff's counsel (R. at 292-95, 297-302, 311-14).

    The record contains the following exhibits pertaining to
Plaintiff's alleged mental impairment: from the Pain Management
Center, a Psychosocial Assessment of Plaintiff based on a July
30, 2003, interview by Donald P. Corriveau, Ph.D., treatment
notes from Dr. Corriveau for individual psychotherapy sessions
with Plaintiff on September 12, 2003, December 22, 2003, and
January 16, 2004, and a letter from Dr. Corriveau to the ALJ
dated February 23, 2004 (R. at 264-68, 269, 303-310, 315); and a
report of a September 25, 2003, consultative evaluation of
Plaintiff by John R. Parsons, Ph.D., requested by Plaintiff's
attorney (R. at 271-280).

### Administrative Hearing

    Plaintiff, represented by counsel, appeared at the hearing
on December 18, 2003.  (R. at 34)  Plaintiff's counsel made an
opening statement in which she noted that Plaintiff has
significant back problems (R. at 37); that "there are several
MRI's in the record"[2] (id.), which showed a herniated disc at
L4/5 with significant degenerative changes at L3/4, L4/5, and
L5/S1 (id.); that Plaintiff "suffers from enormous pain" (id.);
that he has been prescribed both hydrocodone and morphine for his

---

[2] The record actually contains four reports pertaining to the
same December 27, 2001, MRI (R. at 193-94, 199-200, 201-02, 257-58),
not "several MRI's," as counsel stated (R. at 37).

4

pain (R. at 37); that he has difficulty sitting, standing, and
walking (id.); that Dr. Gelch recommended a laminectomy at some
future point (R. at 37-38); that Plaintiff was currently
undergoing epidural steroid injections which helped "a little
bit" (R. at 38) with the herniated disc but not the other discs
(id.); and that he has been diagnosed with depression secondary
to his pain and inability to work or be as active as in the past
(id.).  She argued that "the pain that he has, the limitation in
terms of his ability to move around and his ability to carry or
lift or just even be active in any way, shape, or form leaves him
unable to do any kind of work at all."  (Id.)  She concluded by
stating that "[w]hether it's the depression or the pain that's
actually interfering with his ability to attend and concentrate
and remember, the [e]ffect is the same."  (Id.)

        Plaintiff then testified, stating that he ceased full-time
work two years prior to the hearing.  (R. at 39-40)  He had
worked part-time as a shell fisherman since then, but "[v]ery,
very little" (R. at 40), less than six or seven hours per week at
the time of the hearing (id.).

        Asked by the ALJ why he did not think he could not do any
work, Plaintiff replied:

> I try to do things but the pain becomes unbearable.  I'm
> in constant pain and then when I try to do something,
> just even minor tasks, it gets -- the pain becomes even
> more intense and that -- I just feel depressed and it --
> I don't know if one makes the other worse or -- but it's
> just like I can't even -- to do a normal daily little
> thing, it becomes a project and a job.  Like I can't
> stand for very long.  I can't sit for very long.  I'm in
> quite a bit of pain.  And the medication does help out
> but then that makes like the -- to focus in on anything
> makes it even more difficult for me.

(R. at 44)  Plaintiff testified that he felt pain in the middle
of his lower back, that it was not worse on one side or the

other, and that once in a while it would shoot to the back of his legs.  (R. at 50)  He related that he had been told by Drs. Das and Gelch that he had one herniated disc and three compacted discs; that he had not had physical therapy; that seeing a chiropractor in the past had done nothing for him; that he was receiving epidural steroid injections which helped the herniated disc but not the compacted discs, which gave him chronic pain; and that further procedures were possible for the herniated disc, but nothing could be done for the compacted discs.  (R. at 44, 50-52)  Plaintiff stated that on a good day his chronic pain was five on a scale of zero to ten, and it was eight on a bad day. (R. at 53-54)  He rated the shooting pains as a ten, but stated that with the pain management the shooting pains were somewhat under control.  (R. at 54)

Plaintiff testified that he takes morphine and Vicodin[3] on a daily basis, morphine every twelve hours and usually at least one Vicodin in between.  (R. at 54-56)  Plaintiff stated that although both medications help with the chronic pain, he "still feel[s] it."  (R. at 54)  However, Plaintiff also stated that the medications leave him unable to function, prohibit him from driving, make him drowsy, and render him unable to concentrate at all.  (R. at 55)  He noted that he had not taken any medications that day because he had to drive to the hearing.  (Id.)  In addition, he related that if he takes the medications he cannot drive his children places or help them with their homework because he cannot concentrate.  (R. at 60)

Regarding his depression, the ALJ asked when Plaintiff first noticed symptoms or problems.  (R. at 49)  Plaintiff responded: "I didn't know what depression was and I probably felt like this

---

[3] Vicodin is a brand name for hydrocodone bitartrate and acetaminophen tablets.  See Physician's Desk Reference (57th ed. 2003) ("PDR") at 509.

6

for the last five or six years and then it just seemed to be getting worse .... I didn't realize that's what it was until they started, you know, asking me certain questions and then explaining to me." (R. at 49) He testified that he cries perhaps three or four times a week and, on those days, two or three times a day. (R. at 49-50)

Plaintiff testified that he can sit for fifteen to twenty minutes comfortably, after which time he has to get up and walk around or lie down on the couch because of the pain. (R. at 56) He stated that he cannot stand comfortably at all and that he can stand "[t]olerating maybe 15 to 20 minutes" (id.) and then he has to sit or lie down (id.). He also noted that he has to lie down at least five or six times a day, for 15 minutes to an hour, and that he could not make it through the day without lying down because "[t]he pain just gets too excruciating." (R. at 59) Asked how much weight he could lift comfortably (R. at 56), he responded "[c]omfortably not too much" (R. at 57) and observed that any kind of weight aggravated his pain (id.). As an example, Plaintiff said that he buys two half gallons of milk instead of a gallon. (Id.) According to Plaintiff, changes in the weather, such as rainy or damp weather, affect his chronic pain. (Id.) He noted that he has difficulty getting dressed; that his children help with chores around the house, grocery shopping (including reaching items on shelves, carrying bags, and putting items away) and cooking (because he cannot stand that long); and that his parents, with whom he and his daughters live, help with preparing supper and driving his children to activities. (R. at 46, 57-58)

As for his daily activities, Plaintiff testified that after his children got themselves up and ready for school, he usually cleans up after them, lies down on the couch, and, after resting for a little while, tries to do a few other tasks. (R. at 45)

7

He continued:

> And basically that's how my day goes.  Whatever has to be
> done, it takes a long time and it's a long process to do
> it because I just -- I can't go for very long.  The pain
> just gets to me and then it makes ... me feel low, and
> I'll just lay and my brain starts to think.  I try to
> read a newspaper and I'll get halfway through an article
> and my mind wanders.  I can't keep focused on anything.

(R. at 45-46)  According to Plaintiff, he spends most of his day
lying on the couch, occasionally sleeps, but not for very long,
and watches television, but cannot finish a half-hour program
because he cannot stay focused.  (R. at 47-49, 60)  Plaintiff
related that he used to drive his children to school, but now
they take the bus; he used to take them to sporting events, but
for about a year and a half his parents have been taking them;
and that once in a while he attends his daughters' events, but
can only stay for a little while before having to leave.  (R. at
46)  He stated that he currently does not have any hobbies and
can no longer do the things that he used to enjoy, such as
walking, skiing, and clamming on the beach.  (R. at 58)  He has a
few friends, but he does not see them often because he has little
interest and usually just stays in the house.  (R. at 58-59)  He
does not sleep well at night.  (R. at 47)

Dr. Edward Spindell, an orthopedic surgeon, also testified
at the hearing as an impartial ME.  (R. at 42-44, 61-64)
According to the ME, the record reflected that Plaintiff has had
back pain since he was nineteen and that the pain has become
worse over the past few years.  (R. at 43)  He observed that
Plaintiff had never had back surgery (id.); that the MRI's
revealed bulging discs at L4/5 as well as degenerative changes at
L3/4, L4/5, and L5/S1 (id.); that Dr. Gelch used the term
"central herniated dis[c] at L4/5", id.; that Dr.Gelch's
neurological examination of Plaintiff showed normal motor

8

strength and reflexes (R. at 43); that Dr. Das had recommended
conservative treatment; and that Plaintiff has been seen by pain
management and received epidural injections (id.).  Dr. Spindell
opined that Plaintiff had multi-level degenerative disc disease.
(Id.)  He also noted that Dr. Parsons had evaluated Plaintiff and
diagnosed a major depressive disorder.  (R. at 44)

When asked by the ALJ what functional limitations he would
place on Plaintiff based on the objective findings, the ME
replied that Plaintiff should "avoid continuous and ...
repetitive bending, stooping, lifting above 20 to 25 pounds, and
sit and stand at will." (R. at 61)  Questioned by the ALJ as to
whether the ability to sit and stand at will was a necessity, the
ME replied that it was not and that an ability to sit or to
adjust position every two hours would accommodate that need.
(Id.)  Regarding Plaintiff's medications, the ME testified that
they could or were likely to cause drowsiness and that the
morphine sulfate could impact Plaintiff's ability to think
clearly.  (Id.)  The ME asked Plaintiff whether he had followed
up on Dr. Parsons' recommendation that he have a psychiatric
evaluation.  (R. at 62)  Plaintiff responded that he had seen Dr.
Corriveau and had another appointment with him for later in the
month, but that Dr. Corriveau was a psychologist, not a
psychiatrist.  (Id.)

Plaintiff's counsel then questioned the ME as to whether the
conditions he had described could cause pain, to which the ME
responded affirmatively.  (R. at 62-63)  He added that when an
individual has an "underlying depression ... the perception of
pain could increase" (R. at 63) and that "[t]his is primarily a
pain problem" (id.).  Asked whether Plaintiff's testimony was
consistent with what the record reflected regarding Plaintiff's
condition, the ME stated that he was "somewhat surprised that Dr.
[Guptill] had given him morphine sulphate.  That's pretty

9

strong." (R. at 63) The ALJ inquired whether the dosages were within normal ranges. (R. at 64) The ME replied that "[t]hey're within normal ranges if indicated, it's ultimately indicated." (Id.)

An impartial VE, Carl Barchi, also testified at the hearing. (R. at 64, 65-72) The VE characterized Plaintiff's occupation as a shell fisherman as unskilled work at the heavy exertional level and his work as a swimming pool laborer as semi-skilled work at the heavy exertional level, with no transferable skills. (R. at 64) The ALJ then posed a number of hypotheticals to the VE. (R. at 65-67) First, the ALJ asked whether an individual of Plaintiff's age, education, and vocational background who was capable of exertion at the light exertional level, but with no repetitive bending, crawling, crouching, or stooping, no exposure to dangerous machines or unprotected heights, no driving, and with a moderate limitation of concentration secondary to pain and/or depression limiting the person to simple repetitive tasks would be unable to perform Plaintiff's past relevant work. (R. at 65) The VE answered in the affirmative. (Id.) However, the VE stated that such an individual could perform light cleaning and food preparation activities, with 2,572 and 4,272 such positions, respectively, existing in the Rhode Island and southeastern Massachusetts area. (R. at 65-66) The ALJ's second hypothetical changed the exertional level to sedentary, with no other changes. (R. at 66) The VE responded that there were 1,583 sedentary unskilled assembly jobs and 171 sedentary unskilled cashiering positions which could be performed by the hypothetical claimant. (Id.) The ALJ then returned to the light exertional level, positing a third hypothetical claimant with a moderate to severe limitation in concentration. (Id.) The VE stated that the person would not be able to work at those positions or any similar positions. (Id.) The ALJ's fourth

10

hypothetical, again at the light exertional level, was the same
as the first with the additional need to lie down for up to five
or six times per day for approximately fifteen minutes to an
hour.  (R. at 66-67)  According to the VE, "[t]hat person
wouldn't be able to maintain substantial gainful production
requirements of those positions."  (R. at 67)  Fifth, the ALJ
added to the first hypothetical that the individual should avoid
concentrated exposure to extreme heat or cold.  (Id.)  The VE
stated that his answer to the first hypothetical would not
change.  (Id.)

     Plaintiff's counsel then cross-examined the VE, asking if
the number of available jobs would change if the ALJ's first
hypothetical included a period of at least one hour per day of
moderately severe impairment in the claimant's ability to attend
and concentrate as a result of side effects from medication.  (R.
at 67)  The VE replied that a "person with a moderately severe
inability to focus or concentrate, that person would not be able
to keep that job.  They wouldn't be able to maintain that job if
they had to miss an hour of work a day because of the moderately
severe problem with concentration stemming from medication."  (R.
at 68)  Counsel inquired whether the same limitation would
preclude jobs at the sedentary level, following the ALJ's second
hypothetical, and whether a need to lie down five or six times
daily would preclude jobs at the sedentary level as well.  (Id.)
The VE responded affirmatively to both questions.  (Id.)
Plaintiff's counsel then added "the need to sit and stand at
will" (id.) to the ALJ's first hypothetical, and the VE answered
that sitting and standing would be part of the janitorial and
food preparation positions (R. at 68-69), but that if the need to
sit or stand became "so severe and intrusive that it prevented
production in terms of janitorial or food prep, yes, they
wouldn't last on that job" (R. at 69).  The VE added that the

11

assembling and cashier positions at the sedentary level would require maintaining an expected pace or dealing with the public and that a claimant would have to "keep up with the work demands." (R. at 69)  Plaintiff's counsel asked the VE to give the Dictionary of Occupational Titles ("DOT") numbers for each of the four positions the VE listed.  (Id.)  It was agreed that the VE would submit a post-hearing report.[4]  (R. at 72)

### Standard of Review

The court's function in reviewing the Commissioner's decision is a narrow one.  See Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The court does not reconsider facts or re-weigh the evidence.  See Shoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001); see also Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts."); Lopez v. Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998)("In reviewing the record, the district court must avoid reinterpreting the evidence or otherwise substituting its own judgment for that of the Secretary").  The decision "will be overturned only if it is not supported by substantial evidence,[5] or if it is based on legal error."  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). If supported by substantial evidence in the record, the

---

[4] The VE submitted his post-hearing report on December 20, 2003. (R. at 169-78)

[5] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also Lopez v. Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998); Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

Commissioner's decision must be upheld even if the record could arguably support a different conclusion. See 42 U.S.C. § 405(g) (2005); see also Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987)(noting that Commissioner's determination must be affirmed "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 1127, 131 (1st Cir. 1981)("Although we as the trier of fact might have reached an opposite conclusion, we cannot say that a reasonable mind could not have decided as did the Secretary ...").

## Errors Claimed

Plaintiff alleges that: 1) the ALJ erred in not crediting Dr. Spindell's testimony that Plaintiff's medications could cause drowsiness and that the morphine sulfate could also impact his thinking, see Plaintiff's Brief at 10; 2) the ALJ's reasons for according minimal probative weight to the opinions and assessment of Nurse Neville are not based on substantial evidence, see id. at 12; 3) the ALJ's finding that Plaintiff's depression is not a severe impairment is not based on substantial evidence, see id. at 16; and 4) the Commissioner failed to sustain her burden of establishing that there is other work in the national economy that Plaintiff can perform despite his impairments, see id. at 18.

## Discussion

### I.   The ALJ's Decision

To qualify for DIB, a claimant must meet certain insured status requirements,[6] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act.  See 42 U.S.C.A. § 423(a) (2003)(2005 Supp.).  The Act

---

[6] Plaintiff was insured through the date of the ALJ's decision. (R. at 18, 24)

13

defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C.A. § 423(d)(1)(A). A claimant's impairment must be of such severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C.A. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[7] 20 C.F.R. § 404.1521(a) (2005). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

Following the familiar sequential analysis,[8] the ALJ in the

---

[7] Section 404.1521 describes "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2005). Examples of these include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

[8] The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2005); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Secretary must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the

instant case made the following findings: that although Plaintiff
had worked part-time since his alleged onset date he had not
engaged in substantial gainful activity (R. at 18, 24);[9] that
Plaintiff's physical impairment, namely degenerative lumbar
disc/spine disease, was a severe impairment (R. at 18, 24-25),
but his alleged mental impairment was not (R. at 19, 25); that
Plaintiff's physical impairment did not meet or equal a listed
impairment (R. at 19, 25); that "[t]he severity of the symptoms
and the degree of incapacity [Plaintiff] asserted are not
supported by the record and are not deemed to be credible to the
degree alleged" (R. at 25); that Plaintiff retained the residual
functional capacity ("RFC") to perform work at the light
exertional level such that he could lift and carry up to ten
pounds frequently and twenty pounds occasionally, sit for at
least six hours in an eight-hour workday, and stand and/or walk
for at least six hours in an eight-hour workday, that would allow
him to change positions between sitting and standing
approximately every two hours, and that could be done with the
further nonexertional limitations of inability to be exposed to
concentrated amounts of extremes of temperature or humidity,
unprotected heights, or the operation of dangerous machinery,
that did not require more than occasional bending, crawling,

---

Commissioner's listed impairments; (4) whether the claimant is able to
perform his past relevant work; and (5) whether the claimant remains
capable of performing any work within the economy.  See 20 C.F.R. §
404.1520(b)-(f).  The evaluation may be terminated at any step.  See
Seavey, 276 F.3d at 4.  "The applicant has the burden of production
and proof at the first four steps of the process.  If the applicant
has met his or her burden at the first four steps, the Commissioner
then has the burden at Step 5 of coming forward with evidence of
specific jobs in the national economy that the applicant can still
perform."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

[9] The ALJ noted, however, that "said [part-time] activity would
reflect on his ability to engage in substantial gainful activity since
January 1, 2001."  (R. at 18)

climbing, squatting or stooping, and that could be done with
moderate impairment of his ability to concentrate and persist at
tasks such that he could perform simple repetitive tasks over an
eight-hour workday (R. at 21, 23, 25); that Plaintiff was unable
to perform his past relevant work (R. at 23, 25); and,
considering the VE's hearing testimony and post-hearing report
and using the Medical-Vocational Guidelines (the "Grid") as a
framework, that a significant number of unskilled jobs at the
light and sedentary exertional levels within Plaintiff's RFC
existed in the national economy and his occupational base had not
been substantially compromised.  (R. at 24-25)  Therefore, the
ALJ concluded that Plaintiff was not disabled as defined in the
Act.  (R. at 24, 25-26)

## II.  Analysis

### A.   Side effects of Plaintiff's medications

Plaintiff argues that the ALJ erred in not crediting the
ME's testimony that Plaintiff's medications could cause
drowsiness and that the morphine sulphate could impact
Plaintiff's thinking.  See Plaintiff's Brief at 10-12.  The court
agrees that further consideration of the side effects of
Plaintiff's medications is necessary.

Plaintiff testified at the hearing that he was taking
Vicodin and morphine sulphate for his pain.  (R. at 48, 54-55)
The ALJ questioned Plaintiff regarding his medication as follows:

Q    And the medication, how is that helping with the
     pain?
A    When it gets severe, the chronic pain just gets
     severe, well I have to take the pain and it helps
     but I still feel it.  And it -- and when the --
     with the morphine and the Vicodin's I think that's
     the generic brand, it just makes you where I still
     have some pain but it just makes you where you
     can't function at all.  I can't really -- I cannot
     drive.  I can't --
Q    And you're taking those on a daily basis?

16

```
A    Yes.
Q    So do you --
A    I didn't take any today because I had to drive to
     Providence.
Q    Yeah.
A    Which is quite a task.
Q    So they make you kind of drowsy?
A    Yes.
Q    And problems with concentrating?
A    I have problems with concentrating without taking
     those   but   that   makes   it   where   there's   no
     concentration at all.
```

(R. at 54-55)  After a brief interjection from Plaintiff's counsel, the ALJ resumed her inquiry:

```
Q    Tell me about your medications and the dosages.
A    I take the morphine every 12 hours, like once in
     the morning and once at night.  And if it really
     starts to hurt, I usually take at least one of the
     Vicodin or -- I don't know the -- they said they
     were Vicodin, the doctor, I don't know is it
     Hydrocodone?  I usually take at least one of those
     in between.
```

(R. at 55-56)  Immediately thereafter, the ALJ changed the subject:

```
Q    Now since you're on Viagra, are you currently
     dating?
A    I was up until maybe a month ago.
Q    Okay.   When you were dating, what  kind  of
     activities did you do with your friend?
A    Not much.  She would just come over and we would
     just talk and that was basically it.  Once and a
     while we'd just go for a little drive around the
     block but not that much and I guess maybe that's
     why she's not around any longer.
ALJ  I have nothing further.
```

(R. at 56)

        Dr. Spindell, the ME, testified that the morphine sulphate was "pretty strong."  (R. at 63)  Asked whether the medications were likely to cause drowsiness, or whether it was reasonable to so conclude, the ME responded affirmatively.  (R. at 61)  As for

whether they could have an impact on Plaintiff's ability to think clearly, the ME stated that "[t]he morphine sul[ph]ate could." (R. at 61)

An ALJ is required to consider the "[t]ype, dosage, effectiveness, and **adverse side-effects of any pain medication ....**" Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)(emphasis added).[10] Here, it is not clear to the court that the ALJ did so. See Dominguese v. Massarani, 172 F.Supp.2d 1087, 1099 (E.D. Wis. 2001)(noting that "because [the ALJ] makes only a conclusory statement, I am unable to determine whether he considered the 'type, dosage, effectiveness and side effects' of these medications and why he reached the conclusion he reached."). The ALJ's questioning of Plaintiff regarding the side effects of the morphine and Vicodin was brief, and her written decision is devoid of any analysis of the impact of these side effects on Plaintiff's RFC. The only reference to Plaintiff's pain medication in the ALJ's opinion is her statement that she had "carefully considered [Plaintiff's] allegations/ testimony that he has suffered from constant severe back pain and leg pain (i.e., he claimed that it was on a level of '8' on a

---

[10] Avery requires an ALJ to investigate "all avenues presented that relate to subjective complaints ...." 797 F.2d at 28. The Court of Appeals for the First Circuit in Avery listed the following factors to be considered:

    1.  The nature, location, onset, duration, frequency,
    radiation, and intensity of any pain;
    2.  Precipitating and aggravating factors (e.g., movement,
    activity, environmental conditions);
    3.  Type, dosage, effectiveness, and adverse side-effects of
    any pain medication;
    4.  Treatment, other than medication, for relief of pain;
    5.  Functional restrictions; and
    6.  The claimant's daily activities.

Id. at 29; see also 20 C.F.R. § 404.1529(c)(3) (2005) (listing factors relevant to symptoms, such as pain, to be considered); Social Security Ruling ("SSR") 96-7p, available at 1996 WL 374186, at *3 (same).

scale of '1-10' on bad days and '5' on good days) which was not
relieved [by] prescription pain medication, including narcotic
pain medication that left him unable to function or drive ...."
(R. at 20)  She did not mention Dr. Spindell's testimony that the
medications could cause drowsiness and that the morphine sulfate
could affect Plaintiff's ability to think clearly.  (R. at 61)
The hearing testimony from Plaintiff and the ME appears
inconsistent with the ALJ's finding that Plaintiff could perform
work at the light exertional level with, among other
restrictions, moderate impairment of his ability to concentrate
and persist at tasks such that he could perform simple,
repetitive tasks.[11]  (R. at 21, 23, 25)

     The court finds that the ALJ failed adequately to consider
the side effects of Plaintiff's pain medications and their impact
on his RFC.  Therefore, remand is warranted.  See Wells v.
Barnhart, 267 F.Supp.2d 138, 146 (D. Mass. 2003)(remanding
because ALJ "did not explore the effect of [the plaintiff's]
medication on her ability to concentrate"); see also Critch v.
Barnhart, No. Civ.A. 03-12540-PBS, 2005 WL 662422, at *8 (D.
Mass. Mar. 15, 2005)(holding that ALJ failed to consider adverse
side effects of plaintiff's medications and remanding for
consideration of the effects of those medications in combination
with plaintiff's other impairments on his ability to work); Musto
v. Halter, 135 F.Supp.2d 220, 229, 235 (D. Mass. 2001)(remanding
because ALJ failed to give due consideration to type, dosage,
effectiveness, and adverse effects of plaintiff's pain
medications); Bazile v. Apfel, 113 F.Supp.2d 181, 186 (D. Mass.
2000)(holding that failure to consider at least two Avery

---

     [11] The basis of the ALJ's finding that Plaintiff had a "moderate
impairment of his ability to concentrate and persist at tasks such
that he can perform simple repetitive tasks" (R. at 21, 23, 25) is not
clear to the court.

factors, including side effects of plaintiff's medications,
constituted legal error requiring remand).

Moreover, the record contains neither an RFC assessment from
a treating or examining physician nor one from any source
addressing the side effects of the Vicodin and morphine sulphate.
The only RFC assessments in the record were completed over a year
before Plaintiff began taking these medications.  The RFC
evaluations from the state agency physicians were submitted in
June and August of 2002.[12]  (R. at 232-41, 242-51)  Nurse
Neville's medical questionnaire, physical capacity evaluation,
and pain questionnaire were prepared in September, 2002.[13]  (R.
at 252-55, 287-89)  Plaintiff was taking Vicodin at least as of
September 25, 2003, the date he was evaluated by Dr. Parsons (R.
at 271, 273), and he was prescribed morphine sulphate on November
25, 2003[14] (R. at 301).  Although Dr. Guptill's notes of December
30, 2003, reflect that he had completed a medical questionnaire
(R. at 311), the record does not include a medical questionnaire

---

[12] The DDS physicians, Drs. Bernardo and Fish, both noted that
there was no treating or examining source statement regarding
Plaintiff's functional capacities in the record.  (R. at 238, 248)
Dr. Bernardo indicated that Plaintiff was taking "multiple
med[ication]s" (R. at 233) at that time but did not address any side
effects thereof.

[13] Nurse Neville noted that Plaintiff's medications at the time
were Celebrex and Percocet (R. at 252, 288) and that their side
effects were drowsiness and nausea (R. at 253).  Although the court
has determined that the ALJ properly accorded little weight to Nurse
Neville's opinions, see Discussion section II.B. infra at 23-30, Nurse
Neville included a handwritten comment, which the ALJ apparently did
not follow, suggesting that the question of whether Plaintiff's pain
was of such severity as to preclude sustained concentration and
productivity which would be needed for full-time employment on an
ongoing sustained basis was "best answered by the neurosurgeon Dr. Das
and Dr. Gelch" (R. at 255, 289), who had examined and/or treated
Plaintiff.

[14] Dr. Guptill noted on November 25, 2003, that he would prescribe
MS Contin for Plaintiff's pain.  (R. at 301)  MS Contin is a brand
name for morphine sulphate tablets.  See PDR at 2834.

from him.   Similarly, although Dr. Guptill indicated that he was
"leaving the capacity evaluation for Dr. Doerr" (R. at 311), who
was to conduct a physical capacity evaluation at the request of
Plaintiff's counsel (id.), and Dr. Doerr did, in fact, conduct
such an evaluation (R. at 313-14) and stated that he had filled
out Plaintiff's "papers" (R. at 314), no physical capacity
evaluation from Dr. Doerr appears in the record.   Thus, the ME
was the only medical source to address the side effects of
Plaintiff's narcotic pain medication.

In the circumstances of this case, the court finds that the
ALJ should have obtained an updated RFC assessment from a
treating or examining physician who was in a position to evaluate
the impact of the side effects of Plaintiff's medications on his
RFC.   The court reaches this conclusion based on the following
factors: the lack of an RFC assessment, particularly subsequent
to Plaintiff being prescribed Vicodin and morphine sulphate, from
a treating or examining physician, see Rivera-Figueroa v. Sec'y
of Health & Human Servs., 858 F.2d 48, 51 (1st Cir. 1988)
("Missing from the medical evidence is any residual functional
capacity assessment performed by a treating physician."); Vigo
Ramos v. Comm'r of Social Security Admin., 241 F.Supp.2d 139, 142
(D.P.R. 2003)(noting that "the record is devoid of both a
physical RFC assessment and a mental RFC assessment performed by
examining physicians"); the ALJ's rejection of the only physical
capacity assessment from a treating source, Nurse Neville,
leaving only the RFC assessments from the nonexamining DDS
doctors, see Vigo Ramos, 241 F.Supp.2d at 142 (noting that
although two nonexamining physicians had provided RFC
assessments, the record lacked RFC assessments from examining
doctors); Nurse Neville's suggestion that Drs. Das and Gelch were
in a better position to assess Plaintiff's ability to concentrate
and be productive (R. at 255, 289); Drs. Guptill and Doerr's

21

statements that forms were completed which do not appear in the
record (R. at 311, 314); hearing testimony from Plaintiff that
the medications render him unable to "function at all" (R. at 55)
and from the ME that the morphine sulphate is "pretty strong" (R.
at 63), that it could impact Plaintiff's ability to think clearly
(R. at 61), and that the morphine and Vicodin could cause
drowsiness (id.); and the fact that the burden had shifted to the
Commissioner at step five, see Heggarty v. Sullivan, 947 F.2d
990, 997-98 (1st Cir. 1991)(noting absence of records from
plaintiff's treating physician, non-adversarial nature of Social
Security proceedings, and shift of burden to Commissioner at step
five and holding that ALJ had obligation to develop record more
fully as to current state of severity of claimant's impairment).
Accordingly, the matter should be remanded.  Cf. Manso-Pizarro v.
Sec'y of Health & Human Servs., 76 F.3d 15, 19 (1st Cir. 1996)
(remanding for further proceedings and noting that "we believe
that the record alerted the ALJ to the need for expert guidance
regarding the extent of the claimant's residual functional
capacity to perform her particular past employment"); see also
Rivera-Figueroa, 858 F.2d at 52 ("Absent a residual functional
capacity assessment from an examining psychiatrist, we do not
think the ALJ was equipped to conclude that claimant's condition
was so trivial as to impose no significant limitation on ability
to work."); Rivera-Torres v. Sec'y of Health & Human Servs., 837
F.2d 4, 6 (1st Cir. 1988)("Especially where, as here, claimant
complains of pain, takes pain medication (motrin), and some
objective abnormalities (e.g., muscle spasm, spondyloarthritic
changes of spine) have been found, we think the Secretary should
obtain an RFC evaluation from the consultant who conducted the
examination."); Vigo Ramos, 241 F.Supp.2d at 142 ("In cases such
as this where no RFC assessment is performed by an examining
physician, a remand is warranted.").

Due to the ALJ's lack of consideration of the side effects of Plaintiff's pain medications and the absence of an RFC from a treating or examining physician addressing those side effects, the court cannot conclude that substantial evidence supports the ALJ's finding that Plaintiff is capable of performing work at the light exertional level with moderate impairment of concentration. See Rivera-Figueroa, 858 F.2d at 52 (declining to find that substantial evidence supported conclusion that claimant could perform full range of medium work absent RFC assessment from examining psychiatrist); Musto, 135 F.Supp.2d at 230-31 (finding that because ALJ failed adequately to develop record regarding claimant's pain medications, conclusion that claimant's assertions of pain were not credible and finding that claimant had RFC to perform sedentary work were not supported by substantial evidence in the record). I therefore recommend that the matter be remanded for further administrative proceedings and that the Commissioner direct an ALJ to obtain an updated RFC assessment from a treating or examining physician with specific instructions to consider the impact of the side effects of Plaintiff's narcotic pain medications on his RFC.

**B. Nurse Neville's opinion**

In determining Plaintiff's RFC, the ALJ concluded that the assessment of Nurse Neville would be given minimal probative weight and was not persuasive. (R. at 22) The ALJ stated that:

> Although [Plaintiff's] treating nurse practitioner, Anne Neville, RNP, in September 2002 reports maintained that [Plaintiff] was unable to engage in sustained competitive employment, specifically indicating that [Plaintiff] was unable to perform sitting, standing or walking for even 1 hour at a time or more than 4 hours in a work day, said assessment is inconsistent with the aforementioned record as a whole and pertains to an issue, namely the ultimate issue of disability, which is ... reserved to the Commissioner and an ALJ at the hearing level. In addition, a nurse practitioner is not an acceptable

medical source with respect to residual functional
capacity assessments.

(R. at 22)(internal citations omitted).  Plaintiff contends that
Nurse Neville's "opinion is entitled to 'controlling weight' if
it is 'not inconsistent with the other substantial evidence in
the record.'"  Plaintiff's Brief at 13 (quoting 20 C.F.R. §
404.1527(d)(2)).

Under the applicable regulations and rulings, Nurse
Neville's opinion is not entitled to controlling weight.  In
order for an opinion to be given controlling weight, "[t]he
opinion must come from a 'treating source,' as defined in 20
C.F.R. [§] 404.1502 ...."  Social Security Ruling ("SSR") 96-2p,
available at 1996 WL 374188, at *2.  Section 404.1502 defines
"treating source" as "your own physician, psychologist, or other
acceptable medical source who provides you, or has provided you,
with medical treatment or evaluation and who has, or has had, an
ongoing treatment relationship with you."  20 C.F.R. § 404.1502
(2005).  "Acceptable medical source refers to one of the sources
described in § 404.1513(a) who provides evidence about your
impairments."  Id.  The following are listed as acceptable
medical sources: (1) licensed medical or osteopathic physicians;
(2) licensed or certified psychologists; (3) licensed
optometrists; (4) licensed podiatrists; and (5) qualified speech-
language pathologists.  See 20 C.F.R. § 404.1513(a) (2005).
Nurse practitioners such as Nurse Neville are considered "[o]ther
sources."  20 C.F.R. 404.1513(d) (giving as examples of "other
sources" medical sources not listed in paragraph (a) including
"nurse-practitioners, physicians' assistants, naturopaths,
chiropractors, audiologists, and therapists").  Thus, the ALJ did
not err in declining to give Nurse Neville's assessment
controlling weight.

Plaintiff maintains, nonetheless, that the ALJ was required

24

to consider Nurse Neville's assessment, see Plaintiff's Brief at
15 (citing 20 C.F.R. § 404.1513(d)), and that the ALJ's reasons
for "rejecting," id. at 16, Nurse Neville's opinion are not based
on substantial evidence and cannot be sustained, see id.  The
court finds Plaintiff's argument unpersuasive.  The regulation
states that "[i]n addition to evidence from the acceptable
medical sources listed in paragraph (a) of this section, we may
also use evidence from other sources to show the severity of your
impairment(s) and how it affects your ability to work."  20
C.F.R. § 404.1513(d).  The ALJ summarized Nurse Neville's
reports, evaluated them in the context of the record as a whole,
and gave specific reasons for the weight she accorded to them.
(R. at 22)  Clearly the ALJ considered, and did not "reject,"
Nurse Neville's opinion.

Although Plaintiff cites two District of Massachusetts
cases, Smith v. Barnhart, No. Civ.A. 04-30122-KPN, 2005 WL 548319
(D. Mass. Mar. 4, 2005), and Arroyo v. Barnhart, 295 F.Supp.2d
214 (D. Mass. 2003), in support of his argument that Nurse
Neville's assessment should have been given greater weight, the
court finds those cases to be distinguishable.  In Smith, the
opinions of a therapist were countersigned by "an unassailably
acceptable medical source," 2005 WL 548319, at *7, and,
therefore, were entitled to "significantly greater weight than
that assigned by the ALJ," id.  In the instant matter, by
contrast, Nurse Neville's opinions were not countersigned by Dr.
Keigwin or any other physician.  In fact, Nurse Neville noted
that the question of whether Plaintiff's pain was of such
severity as to preclude sustained concentration and productivity
needed for full-time employment on an ongoing sustained basis was
"best answered by the neurosurgeon Dr. Das and Dr. Gelch."  (R.
at 255, 89)  In Arroyo, the ALJ accorded little weight to the
opinions of a claimant's doctor and nurse because they had been

solicited by the claimant's counsel for purposes of the application for benefits.  See 295 F.Supp.2d at 220.  The magistrate judge declined to accept that rationale and also found that the alternate ground articulated by the ALJ, that the nurse was not an acceptable medical source, was tainted by the impermissible reason given.  See Arroyo, 295 F.Supp.2d at 221-22. Here, there is no similar suggestion.

Plaintiff also contends that Nurse Neville's assessment is "not inconsistent,"[15] Plaintiff's Brief at 14, with the opinions of Drs. Corriveau and Doerr and the testimony of Dr. Spindell, the ME, see id.  Dr. Corriveau opined that Plaintiff "is not capable of gainful employment at this time." (R. at 315)  The ALJ found that "while Dr. Corriveau stated in a report dated February 23, 2004, that the claimant was disabled,[16] it can be inferred ... that this was related in pertinent part to his physical condition, an area beyond his field of expertise ...." (R. at 22)  Dr. Doerr indicated that Plaintiff "is capable of minimal in regards to bending or lifting and should alternate stand and sit, avoid uneven surfaces ...." (R. at 313-14)  The ALJ noted this statement (R. at 21), but observed that Dr. Doerr

---

[15] Social Security Ruling ("SSR") 96-2p defines "not inconsistent" as:

> a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.
>
> Whether a medical opinion is "not inconsistent" with the other substantial evidence is a judgment that adjudicators must make in each case.

SSR 96-2p, available at 1996 WL 374188, at *3.

[16] A statement that a claimant is disabled is an opinion on the ultimate issue of disability, which is reserved to the Commissioner. See Discussion section II.B. infra at 28-30.

"was otherwise nonspecific as to [Plaintiff's] functional limitations"[17] (R. at 22).  As for the ME's testimony, it is true, as Plaintiff recounts, that the ME stated that Plaintiff's condition could cause pain (R. at 62-63) and that "[t]his is primarily a pain problem" (R. at 63).

There is, however, contrary evidence in the record.  The ALJ noted the ME's testimony that Plaintiff could "perform[] work activity that did not require repetitive stopping, bending or lifting of 20-25 pounds and that would allow him to change positions approximately every 2 hours ...."  (R. at 21)  The ALJ also noted that the state agency physicians, Dr. Bernardo and Dr. Fish, found Plaintiff to be capable of lifting and carrying ten pounds frequently and twenty pounds occasionally, sitting for about six hours in an eight-hour workday, and standing and/or walking for about six hours in an eight-hour workday, with further nonexertional limitations of being limited to occasional climbing, balancing, stooping, crouching, kneeling and crawling and not being exposed to extremes of cold or hazards such as unrestricted heights or dangerous machinery.  (Id.)  In addition, as the ALJ stated, "surgery has not been recommended, [Plaintiff] has been treated strictly conservatively with pain medication and epidural injections, and since July 2003 at a pain clinic."  (Id.)  The ALJ again observed that Plaintiff continued to work part-time as a shell fisherman (id.), which "activity would reflect on his ability to engage in substantial gainful activity"

---

[17] Even if the "papers" (R. at 314) Dr. Doerr stated he completed, but do not appear in the record, contained such specific functional limitations, it is the ALJ's responsibility to resolve conflicts in the evidence, see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the Secretary, not the courts."); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987) ("Conflicts in the evidence are, assuredly, for the Secretary--rather than the courts--to resolve.").

(R. at 18).

Based on the foregoing, it is clear to the court that the ALJ could reasonably have concluded that Nurse Neville's assessment is inconsistent with other, substantial evidence in the record. See Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 1127, 131 (1st Cir. 1981)("Although we as the trier of fact might have reached an opposite conclusion, we cannot say that a reasonable mind could not have decided as did the Secretary ....").  It is the Commissioner's responsibility, not the court's, to resolve such conflicts in the evidence. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the Secretary, not the courts."); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987)("Conflicts in the evidence are, assuredly, for the Secretary--rather than the courts--to resolve.").

Finally, Plaintiff alleges that the ALJ's statement that Nurse Neville's opinion "pertain[ed] to an issue, namely the ultimate issue of disability, which is ... reserved to the Commissioner and an ALJ at the hearing level" (R. at 22) "is simply not accurate," Plaintiff's Brief at 14.  Section 404.1527(e) provides that opinions on certain issues, such as a claimant's RFC or the ultimate issue of disability, are reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e) (2005).[18]

---

[18] According to the regulation:

Opinions on some issues, such as the examples that follow, are not medical opinions as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.
(1) Opinions that you are disabled.  We are responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, we

Clearly Nurse Neville's opinions that Plaintiff "cannot sustain competitive employment on a full-time, ongoing basis[] [a]t this time" (R. at 253) and that his "pain [is] of such severity as to preclude sustained concentration and productivity necessary for full-time employment on an ongoing sustained basis" (R. at 255, 289) qualify as statements that Plaintiff is "disabled," 20 C.F.R. § 404.1527(e)(1), or "unable to work," id., and, therefore, pertain to an issue reserved to the Commissioner, see 20 C.F.R. § 404.1527(e); see also SSR 96-5p, available at 1996 WL 374183, at *5 (noting that "[m]edical sources often offer opinions about whether an individual who has applied for ... disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions" and that "[b]ecause these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner"). The ALJ was not required to accept those conclusions. See Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) ("The ALJ was not required to accept the conclusions of claimant's treating physicians on

---

review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
(2) Other opinions on issues reserved to the Commissioner. We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity, or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.
(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

20 C.F.R. § 404.1527(e) (2005); see also SSR 96-5p, available at 1996 WL 374183, at *2.

the ultimate issue of disability."); 20 C.F.R. § 404.1527(e) ("A
statement by a medical source that you are 'disabled' or 'unable
to work' does not mean that we will determine that you are
disabled.").

The ALJ properly considered Nurse Neville's assessment in
the context of the record as a whole and gave three specific
reasons, all valid, for according it minimal probative weight.
The court finds no fault with the ALJ's decision in this regard.

### C.   Plaintiff's Alleged Mental Impairment(s)

The ALJ found that Plaintiff did not suffer from a severe
mental impairment because "the record fails to document that
prior to on or about July 2003, he suffered from a medically
determinable mental impairment (affective disorder) which
significantly affected his ability to engage in basi[c] work
related activities ...."  (R. at 18-19)  Plaintiff argues that
the ALJ's finding is not based on substantial evidence.  See
Plaintiff's Brief at 16-18.

Although the ALJ recognized that "the notes of the St.
Anne's Hospital Pain Management clinic, including his treating
psychologist Donald Corriveau, Ph.D., and the psychological
evaluation of [Plaintiff] by John Parsons, Ph.D., who evaluated
him in October 2003 at the referral of [his] representative,
reveal[] that [Plaintiff] has suffered from depression" (R. at
19), she concluded that:

> [T]here is no medical evidence of [Plaintiff] suffering
> from depression, prior to him being seen at the St.
> Anne's Hospital Pain Management Clinic in July 2003.  In
> addition, prior to said time he did not allege in
> statements submitted in support of his application that
> he suffered from depression, nor was this noted by other
> treating and examining sources.  It would be expected
> that he would have alleged or mentioned same prior
> thereto if he was experiencing significant depression
> prior to July 2003.  Further ... since July 1, 2001, the
> alleged onset of disability, he has continued to work

30

part-time as a shell fisherman.

(R. at 19)(internal citations omitted).  The ALJ also noted that
the record failed to document marked impairment of Plaintiff's
daily activities, social functioning, or ability to concentrate
and persist at tasks or repeated episodes of decompensation.
(Id.)

> Regarding Dr. Corriveau, the ALJ concluded:

[W]hile Dr. Corriveau stated in a report dated February
23, 2004, that [Plaintiff] was disabled, it can be
inferred ... that this was related in pertinent part to
his physical condition, an area beyond his field of
expertise, as it must be pointed out that he indicated if
[Plaintiff's] physical impairment resolved that this
would be expected to result in resolution of his
psychological symptoms, and he did not set forth specific
functional limitations related to his mental impairment.
Although a treating psychologist is the preferred source
for an assessment of a claimant's mental capabilities and
limitations, and such an assessment may be controlling
under some circumstances (i.e., if well supported by
medically acceptable data and not inconsistent with other
substantial evidence), an opinion that the claimant is
disabled or unable to work is an issue reserved to the
Commissioner and is not controlling.  Accordingly, the
assessment of Dr. Corriveau is given minimal probative
weight and is not considered to be persuasive.

(R. at 20)(internal citations omitted).

The court finds no error in the ALJ's treatment of Dr.
Corriveau's opinion.  His statement that Plaintiff was not
capable of gainful employment was clearly related to Plaintiff's
physical impairment (given the fact that Dr. Corriveau indicated
that when Plaintiff's physical condition improved, his
psychological symptoms would as well), no functional limitations
resulting from Plaintiff's mental impairment were outlined (and
none can be inferred from Dr. Corriveau's brief progress notes),
and the ultimate issue of disability is reserved to the

31

Commissioner,[19] as the ALJ correctly observed.

The ALJ summarized Dr. Parsons' report as follows:

> Dr. Parsons stated that [Plaintiff] had a GAF of 50,[20]
> which is consistent with only mild impairment of social
> and occupational functioning, and specifically indicated
> in a mental residual functional capacity assessment form
> that [Plaintiff] had only mild impairment of his ability
> to relate with others and of his ability to understand,
> carry out and remember instructions, and moderate
> impairment of his ability to deal with coworkers and of
> his ability to perform simple and repetitive tasks.  In
> view of the fact that said assessment is consistent with
> and supported by the record as a whole, it would be
> entitled to significant probative weight.  Although Dr.
> Parsons opined in that same mental residual functional
> capacity assessment that [Plaintiff] had moderately
> severe impairment of his daily activities, of his ability
> to deal with supervisors, of his ability to deal with
> ordinary work pressure and of his ability to perform
> complex or varied tasks, this portion of his assessment
> is inconsistent with [Plaintiff's] work activity and the
> aforementioned GAF and assessment of Dr. Parsons.
> Accordingly, it is given limited probative weight with
> respect thereto.

(R. at 19-20)(internal citations omitted).

The ALJ properly credited the part of Dr. Parsons'
assessment which she found to be consistent with and supported by
the record as a whole and accorded limited probative weight to
the portion she found was inconsistent with the record.  See SSR
96-5p, available at 1996 WL 374183, at *4 ("[M]edical source
statements may actually comprise separate medical opinions
regarding diverse physical and mental functions ... and ... it
may be necessary to decide whether to adopt or not adopt each
one.").  However, her statement that Dr. Parsons found "a GAF of

---

[19] See Discussion section II.B. supra at 28-30.

[20] "GAF" refers to the Global Assessment of Functioning Scale,
which considers psychological, social, and occupational functioning on
a hypothetical continuum of mental health-illness.  See Diagnostic and
Statistical Manual of Mental Disorders (4th ed.) ("DSM-IV") at 34.

50, which is consistent with only mild impairment of social and
occupational functioning" (R. at 19), is incorrect.   Dr. Parsons
listed Plaintiff's current GAF, and highest GAF during the
previous year, as 58, not 50.   (R. at 278)  A GAF of 58 is
indicative of moderate symptoms or moderate difficulty in social
or occupational functioning, see Diagnostic and Statistical
Manual of Mental Disorders (4[th] ed.) ("DSM-IV") at 34, not "mild
impairment of social and occupational functioning" (R. at 19).

   The court concludes that, overall, the ALJ's error is
harmless and that her finding that Plaintiff did not suffer from
a severe mental impairment is supported by substantial evidence.
The court reaches this conclusion for several reasons.   The ALJ
thoroughly evaluated Plaintiff's alleged mental impairment,
discussed the entirety of the medical evidence in the record
pertaining thereto, and gave specific reasons for the weight
accorded to those reports.   Moreover, as the ALJ noted (R. at
19), the record is devoid of any medical evidence pertaining to
Plaintiff's alleged mental impairment prior to July of 2003,
despite Plaintiff's testimony that he "probably felt like this
for the last five or six years"[21] (R. at 49).

   For example, although some of the notes are illegible, there
do not appear to be any references to complaints of depression in
the exhibits from NHCC Medical Associates.   (R. at 209-31, 281-
86, 290-91)  Dr. Das indicated that Plaintiff denied suffering
from serious depression and made no mention of any serious
psychiatric disorder (R. at 195) and also that Plaintiff's mental
status exam was normal, with intact memory and normal

---

   [21] Asked by the ALJ when he started noticing problems with
depression, Plaintiff responded that "I didn't know what depression
was and I probably felt like this for the last five or six years and
then it just seemed to be getting worse ....   I didn't realize that's
what it was until they started, you know, asking me certain questions
and then explaining to me."  (R. at 49)

orientation, attention span, and concentration (R. at 196).  Dr.
Gelch noted no psychiatric or psychological complaints.  (R. at
205-08)  Although Plaintiff reported to Dr. Gelch on February 13,
2002, and to Newport Hospital on March 6, 2002, that he was
taking Risperdal[22] (R. at 205, 260), there is no indication in
the record regarding who prescribed this medication or when it
was prescribed.  Nor did Plaintiff list Risperdal on the
disability report dated April 30, 2002, the Activities of Daily
Living summary dated June 19, 2002, or the list of medications he
submitted at the December 18, 2003, hearing.  (R. at 131, 156,
296)  Although he alleged that he was disabled due to depression
as well as pain at the December 18, 2003, hearing, Plaintiff did
not so allege at the time of his initial application or on
reconsideration.[23]  (R. at 18-19, 75-76, 78, 83, 126, 160-61,
162)

Based on the lack of treatment for depression prior to July
of 2003 and the absence of evidence in the record that Plaintiff
complained of depression or viewed himself as depressed, the
court finds that the ALJ could reasonably have concluded that
Plaintiff did not suffer from a severe mental impairment.  See
Irlanda Ortiz v. Sec'y of Health & Human Services, 955 F.2d 765,
770 (1st Cir. 1991)("The lack of any evidence of sustained
treatment in this case only bolsters our decision that the record
adequately supports the Secretary's final conclusion that
claimant was not disabled."); Cava v. Barnhart, No. 03 Civ.
6621(DC), 2004 WL 1207900, at *10 (S.D.N.Y. June 1, 2004)

---

[22] Risperdal is a psychotropic agent used for the treatment of
schizophrenia.  See PDR at 1786 (57th ed. 2003).  However, Plaintiff
told Dr. Parsons on September 25, 2003, that he "was never tried on
psychotropic medication."  (R. at 274)

[23] Indeed, on the Reconsideration Disability Report, when asked
whether he had any additional illness or injury, Plaintiff listed high
blood pressure and ulcer.  (R. at 162)

34

("Nowhere in his applications did plaintiff refer to a history of depression or other psychiatric impairment in his application."). As the First Circuit stated in Irlanda Ortiz:

> Moreover, aside from the five therapy sessions claimant attended through the SIF, there is no record of any other mental health therapy during his insured status. As a result, there is no way of telling whether psychiatric treatment could have improved these "marked" limitations. We do not think that a claimant with a diagnosed impairment may assert entitlement to disability benefits without at least securing a determination concerning what, if any, treatment options are available to him or her. Indeed, "[i]mplicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work.

Irlanda Ortiz, 955 F.2d at 770 (quoting Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir. 1988)(per curiam)(alteration in original). There is no indication that Plaintiff followed up on Dr. Parsons' suggestion that he seek a psychiatric evaluation to ascertain whether psychotropic medications would help to alleviate his condition. Furthermore, the ALJ observed that Plaintiff continued to work part-time (R. at 19), undermining his claim that his depression prevented him from working, see Musto v. Halter, 135 F.Supp.2d 220, 225-26 (D. Mass. 2001)("[E]vidence of an impairment is not enough to warrant an award of benefits; there must also be evidence in the record that the impairment prevented the claimant from engaging in any substantial activity."); see also id. at 233 (noting that there was no indication that the plaintiff's depression rose to the level of "interfering with his ability to engage in any substantial gainful activity")(citation and internal quotation marks omitted).

Based on the foregoing, the court concludes that the ALJ's determination that Plaintiff's mental impairment is not severe is supported by substantial evidence in the record. Accordingly, I

do not recommend remand on this issue.

## D.   **Step Five Finding**

The ALJ concluded that a significant number of jobs existed in the national economy which Plaintiff was capable of performing.  (R. at 24, 25-26)  Plaintiff contends that the Commissioner has failed to sustain her burden of proving that there is other work in the national economy that Plaintiff can perform because the ALJ failed to properly weigh all of Plaintiff's functional limitations in the hypothetical given to the VE.  See Plaintiff's Brief at 18-19.  Specifically, Plaintiff claims that the ALJ's hypothetical questions to the VE were deficient because they failed to: (1) include the functional limitations found by Nurse Neville; (2) consider all of the functional limitations flowing from Plaintiff's mental impairments and (3) consider the impact of the side effects from Plaintiff's medications.  Id. at 19.

The court has already determined that the ALJ's treatment of Nurse Neville's opinions and evaluation of Plaintiff's alleged mental impairments are not flawed.  The court therefore rejects Plaintiff's challenges to the ALJ's step five finding on these grounds.

The court's determination that remand is necessary for further evaluation of the side effects of Plaintiff's medications, however, may affect the ALJ's RFC finding and conclusion that other work exists in the national economy which Plaintiff is capable of performing.  Accordingly, the Commissioner is directed to instruct an ALJ to reassess Plaintiff's RFC in light of his or her reconsideration of the impact of the side effects of Plaintiff's medications. Additional testimony from a VE may be required.

### **Summary**

For the reasons stated above, I recommend that the case be

remanded to the Commissioner for further administrative
proceedings consistent with this opinion.  On remand the ALJ
should be directed to consider whether Plaintiff's side effects
from his medication severely impair his ability to concentrate,
and whether that finding alters the ALJ's finding that Plaintiff
retains the RFC to perform a significant range of light work.
The court finds no error in the ALJ's treatment of the opinion of
Nurse Neville and finding regarding Plaintiff's alleged mental
impairments.

### Conclusion

The court finds that the Commissioner's decision that
Plaintiff is not disabled is not supported by substantial
evidence in the record and is not legally correct.  Accordingly,
I recommend that Plaintiff's Motion to Remand be granted and that
Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be
specific and must be filed with the Clerk of Court within ten
(10) days of its receipt.  See Fed. R. Civ. P. 72(b); D.R.I.
Local R. 72(d).  Failure to file specific objections in a timely
manner constitutes waiver of the right to review by the district
court and of the right to appeal the district court's decision.
See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir.
1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605
(1st Cir. 1980).

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
January 26, 2006